2-15-0375. People in the state of Illinois believe it's happening. Can you release Moreta, defendant of felonies? On behalf of the defendant of felonies, Ms. Amy Fick. On behalf of the defendant of felony, Ms. Alyssa Winslow. Okay, thank you. Ms. Fick. Good morning, your honors. Counsel. My name is Amy Fick from the Office of the State Appellate Defender. I represent the defendant of felonies, Luis Moreta. May it please the court. This case involves historical cell site analysis and how that data should be presented to a jury as evidence in a criminal trial. Historical cell site analysis as background is the term that's used to describe the process of examining phone records to determine which towers were used to connect a cellular call. Here are the cell phone records of this case. Could I interrupt you? Yes. I want to take care of some business. The state filed a motion seeking to file a surreply in relation to a case that was not cited in your first brief but was cited in your reply brief. And because of the time frame, you still have some time to object, so I'm asking you if you have any objection to the surreply. Thank you. I do not have an objection. Thank you. You may proceed. The cell phone records were a key to the state's case here. And because the evidence was closely balanced, it was essential that the cell information be presented to the jury accurately. In a pre-trial hearing on the defense's oral motion in limine, the defense counsel argued that testimony about cell sites is the province of experts. The state planned to call on... Could I interrupt you one more time? Mr. Mangan? Case number is 15. This is a divorce. Good. That was interesting. I was looking for something. Not that I... I've memorized them all, so I don't need the... You may proceed again. Thank you. No more interruptions. The state planned to call a lay witness here to discuss those cell phone records. To mollify the concerns of the court and the defense counsel, the state assured the trial judge several times that the testimony would be limited. They said, quote, saying the phone records say it went through this tower, and ladies and gentlemen, this tower is located here, and that's it, other than the crime scene is here. But both the lay witness, excuse me, and the state exceeded those boundaries. Exacerbating the error when Detective Rita... Exactly how did they do that? There are several instances. I can start with Detective Rita. He said several statements about the radius of a cell phone tower, but had no training to base that information on. There was statements about which towers would connect to a phone, cellular call, but again, because of the various variables that exist, he had no basis on which to say that that would be the determinative tower that the cell phone bounced off of. I think he was asked what was the radius, and I think he said something like three miles, did he not? Correct, one to three miles. As the quote lies, what's the distance between the apartments where the robbery took place and the defendant's Northlake apartment? I believe in a straight line he had measured, and it was .81 miles, if I'm correct. I don't think so. No, I have it in my brief, if you would... Well, if you did a Google map of directions, it's something like 10 miles, depending on whether you take the shorter route, which might be 8.1 miles. And so, crows don't drive, so that wouldn't be accurate. But I think it's, based on my observation of the map, it's more than 5 miles, maybe 6. Did the exhibit that was presented show any cell towers in addition to the ones that were pinged? In other words, if you counted from X to X plus 1, 2, 3, and 4, regardless of which way you went, how many cell towers could have possibly been pinged because they were in the vicinity? The exhibit did not show that. It showed the towers that were pinged according to the cell phone records that were obtained through the search warrant. The latitude and longitude were provided, as well as a list of sites, T sites and T cells that you combined to find the tower. And while that information was presented, isn't the information that everyone can understand and is not expert the fact that there was a call between the two phones at some point in time in the immediate proximity of this event? The fact that there were calls between the phones, absolutely. That is within the common knowledge that can be read by a lay witness. And that was presented, correct? That was. The issue is that in addition to that, there was the records that testified about which towers they pinged off of, for lack of a better term. First of all, the information on those records are difficult to comprehend. There's a lot of numbers. There's a lot of sites that are in the record. And so it does take somebody with specialized knowledge to even understand how the latitude and longitude relate to which site is listed in the columns. I'm sorry. Go ahead. I think I was in grade school when I dealt with maps and latitude and longitude. So what's in addition to what I learned in grade school that would be so sophisticated that it would make it difficult to understand? I think the Mercator map was the one that I enjoyed the most because it was a rectangle. But be that as it may. Is it your contention that latitude and longitude is something within the realm only of expert knowledge? No. The additional information that was provided on those records included the names of sites, such as ORD-51. And that has to be determined by some other additional information other than what those sites mean. If that answers your question. Let's go back to mine. What part did the pinging or how it pinged or where it came from have to do with this particular conviction? First of all, because the evidence was closely balanced here, it was essential for the jury to have the accurate information about how a signal goes from a tower. It's common knowledge that people understand cell phones emit signals that reach a tower. But beyond that and how they reach that and which tower they reach that is not common knowledge, is my contention. But how did the state use it then? Because that's the issue here. If it's in there and it's improper, how was it used to get this particular conviction? I have a few examples, if you don't mind me reading. First of all, this is Detective Rita. He was describing the difference between information obtained from the emergency request and the search warrant. And he said, quote, the search warrant provided me with cell phone towers in the area that all three or all the cellular telephones would connect to if there was a phone call made. That way it gives a radius or a distance of where they're at either when a telephone call is placed or received. The issue with that is that the cell phone towers in the area that all three or the phones would connect to because we don't know that. There are multiple variables that can affect that. For instance, the signal strength of towers, the height of antennas, the direction of the antennas, man-made or natural obstructions, the cell phone itself, whether the caller is inside or outside. There's multiple issues that really play into the fact that although cell phones connect to the tower with the strongest signal, it is not necessarily the signal closest to where the caller or recipient is at. How do you respond to what appears to be a situation of inconsistency relative to the fact that the first ping allegedly took place in DuPage County and the second ping allegedly took place in Northlake in Cook? All things being equal, if the person was at his apartment as he claimed, how could, put another way, all the things that you related don't seem to relate to the simple fact that in one instance the thing pinged off something that was eight miles away as opposed to the second ping, which was within the vicinity of his apartment. The fact that it didn't ping the first time on the Northlake tower doesn't necessarily establish that he was present during the armed robbery. But it goes a long way to establish that this alibi was less than credible. The alibi witnesses, I believe it was Allison DuVernetti, testified that Mr. Moretta left his cell phone in the van that was used by Christian Ross Emerson. He was not with his phone at that time. So according to the alibi and our contention is that that is why it would show up in that situation. There's multiple reasons why it could have gone up different towers. But that is the contention that, you know, even if he was within that vicinity, it doesn't put him at the crime scene. It doesn't, you know, there's no victims who identified him. So with this evidence that's closely balanced. If that's your contention, how is this evidence so pivotal that its inadmissibility is prejudicial? Particularly because of the closing that the prosecutors, they went beyond their self-imposed limitations. They said they would only speak about which tower was hit, not what that means. But that is exactly what they did. And they drew inferences that were not based on evidence. And because of that, the jury was making a decision based on speculation, not on all the facts presented. It was too prejudicial to be presented to them in that manner. For example, one of the prosecutors in closing said, the search warrant provided me with cell phone towers in the area that fall free. I'm sorry, that was weird. The prosecutor said, we know the cricket phone is there because at 9 or 2 p.m. again, just after the 9 o'clock news, just after the 9 o'clock news started, that cricket phone gets called and pings off a cell tower right there on Swift Road. That is exactly the issue that we have because we do not know that. The proximity, again, does not necessarily relate to which tower a cell phone pings off of. In another instance, the prosecutor said, but the thing you also have to think about, if you want to use their story, if you want to use their story, they're going with how did that business phone, that cricket phone, ping off a cell tower in Northlake about a half hour or so after the armed robbery. Okay, somehow that phone was at the armed robbery. Somehow it got to ping off a cell tower right by his apartment. Those are inferences that this prosecutor should not have been able to make without expert testimony saying, explaining how the pings occur, what can impact them. I have a few other examples. Before you go there, weren't there records that were actually introduced, possibly over objection, but introduced to the jury that they could look at about these towers? Right. The foundation that the records were business records, that was stipulated too. The contents were not. But the jury was looking at them. Correct. And so why couldn't the testimony about generally what they said and what they looked like come before the jury? Because to be relevant and probative, those records need context. And the one to be able to provide that accurately is someone who's trained in recognizing these patterns or the towers. It is too prejudicial. Additionally, the state had said that it would limit its testimony. So for the prosecutor then to make those inferences that are not based on evidence, that require expert testimony, it went beyond what could possibly be known in the evidence. Well, you've said, I think, at least two things, maybe more. One is that the inferences to be drawn by the state weren't proper. And we can either take that at face value or we can apply it in context. If we take it at face value, then it's a general proposition, and it means that the state is not allowed to render or submit inferences based upon the evidence. So I don't think that's what you meant, because that's wrong. So in context, I assume, is what you're referring to. Yes. And in context, since there was no expert opinion rendered nor allowed, and as long as it was based upon the exhibits that were admitted as evidence, how is this contextually improper? Again, because the defense counsel was operating under the assumption... You may continue. Under the assumption that the state was going to limit its testimony. And because it was going to limit its testimony, because there was the objection to the fact that inferences cannot be drawn from someone who is not an expert, those inferences were not based on the evidence. So in this context, it was speculation to the jury rather than a reasonable inference. Any other questions? Well, I'm going back to the fact that... Yes, thank you. The fact that the record... Some records are in, and at the trial court, the counsel says, look, I acknowledge that the records are in of what cell tower it pinged off of. But then he said, but I don't want the officer to say that's the cell tower. Well, if the evidence is in that says that's the one it pinged off of, what is the officer... Why is it a problem that the officer would say that's the cell tower it pinged off of? There is absolutely that cell towers were admitted without contention as to what they said. That information standing on its own is too prejudicial. And while it may be acceptable to be admitted, our contention is that the jury cannot correctly or accurately decipher what that means. So their decision and the inferences made and the speculation is not based on the evidence. It's only based on what they assume. If I understand your argument, you are basically saying that the defendant wasn't present at the Arbor Arboretum because he wasn't in possession of his phone? Correct. This isn't the typical case where you're talking about somebody who claims that the phone was with him but I wasn't there because supposedly the ping was improper. If the phone was in the van, as your client says, how did your client know whether or not this was improper or not? I'm sorry? Do you want me to repeat it? Would you mind? It seems somewhat esoteric. In many of these types of cases, the defendant's complicity or participation in the crime is based upon the fact that he was in custody of his phone and his phone was found someplace, which meant that if he was in custody of his phone, he was where the phone was. But in this case, he's claiming that he wasn't where the phone was. Correct. And therefore, if he's claiming that he wasn't with the phone, then how does all this pinging, how is it established if he wasn't with the phone anyway? How is this so incriminating or substantial that you claim that prejudice arose? It's because the jury weighs the credibility. It's because of the inferences. It's because that it would be within the common knowledge of a jury to assume that someone is with their phone when it's not necessarily true. Wait a second. That's what he testified to. He testified that my phone was in the van and I wasn't in the van. Correct. That's a credibility issue. They either believed him or they didn't. Correct. If his story is the phone was in the van and I wasn't in the van, where's the prejudice here? The prejudice here is because it got introduced in the first place and it gave undue weight to this information with the jury. But what difference does it make? If your client says, my phone and the van are in a different location than I am, the inference is somebody's using my phone. Right. So how does that prejudice him? To me, it bolsters his story. It very well may. But the prejudice here is that you have the jurors using their own common knowledge, which is not necessarily accurate, to make all of these assumptions. And maybe some believed him, maybe some did not. Maybe some associated the fact that, you know, oh, that phone was there and it pinged off that tower, so clearly he was there. You know, that couldn't weigh into their decision. We do not know how much. But it clearly makes it inappropriate because it's not based on the evidence. Okay. You'll have an opportunity to meet the butler. Thank you, Your Honors. Thank you. Ms. Rebulinski? Is that how you pronounce your name? It's Rebulinski. Rebulinski? Yes. Good morning, Justice. Is that Russian? No, it's Polish. It's eastern Polish, so pretty close. SKI is Polish and SKY is Russian. Yes, very close on the border. Okay. Good morning, Justices. May it please the Court. Alyssa Kathleen Rebulinski arguing on behalf of the people of the state of Illinois. Your Honors, in this case, this case does not hinge on the cell phone records. The cell phone records in this case merely corroborate the objective evidence in this case, Your Honor. When looking at the evidence as a whole, what we have here is a situation where there's two co-defendants who state that the defendant was, in fact, part of the armed robbery. Do you agree with opposing counsel that the evidence was closely balanced? I do not, Your Honors. In terms of the evidence, Your Honor, what we have here is not only do we have two co-defendants' testimonies, which line up to be exactly the same, we also have two eyewitnesses. The two eyewitnesses, their testimony also corroborates what the two co-defendants said. In addition to that, Justices, we have objective evidence. The objective evidence is the van that was described by the two eyewitnesses as being the van that was used in the armed robbery, the black van. The two eyewitnesses described that van to a T, calling it a black van with a chrome bumper with damage. That exact van was found outside the defendant's home. Not only was it found outside the defendant's home, but Detective Rita saw the defendant driving that van. In addition to that van, Your Honors, the two eyewitnesses described a black revolver, or a dark-colored revolver, as being held to the head of one of the victims. That revolver was found in the defendant's home. Isn't that a stretch? I mean, I think there are probably about 50 million black revolvers in the United States right now. That's correct, Your Honors. But the thing is that that exact description, the witnesses were shown that revolver, and they said, yes, that was a revolver used on December 2, 2011, as well as the two co-defendants said that was a revolver that the defendant, in fact, used on that date and time. Well, if there are 50 million, and I'll accept that term for purposes of this argument, to say that's the revolver, did they say that's the revolver that was used, or did they say that looks like the revolver that was used? The two eyewitnesses said that that looked like the revolver that was used, and then the two co-defendants said that that was the revolver that was used. At least it's consistent. That's correct, Your Honors. In addition to the other objective evidence we have here, Your Honor, as I said previously, the two co-defendants explained in great detail the plan for the armed robbery and the two prior plans for armed robberies that did not work. In addition to that, putting aside the latitude and longitude that was in the cell phone records, if you look at the time of the calls and the phone numbers between the calls, you heard Christian Ross Emerson state that at 9.02 he called the defendant's phone and they spoke for approximately 34 seconds regarding whether to go through with the armed robbery, and that was corroborated by that record. Did you handle the trial? Sorry, what did you say, Justice? Did you prosecute the trial? I did not, Your Honor. Was the locations of cell towers between the two points, the robbery and the residence, ever subpoenaed? To my knowledge, there was no evidence of that. So there was never anything contained of record indicating the number of interposing cellular towers in the vicinity or between the two points that I've mentioned? None of that was placed into evidence, Your Honor. Correct. In terms of the cell phone towers, Justices, in terms of the location of the cell towers, when looking at the records, there's case law that's overwhelming in terms of the point that if the only evidence being placed into evidence is specifically the information from the cell towers, that that is not expert testimony, that that is lay witness testimony, and that was fleshed out in my brief, Justices, in terms of that. As well as in People v. Fountain, you can see that the First District, while not directly ruling on the same issue, stated that they believe that the historical cell data is not something that's new, novel, or scientific. Much case law speaks to the fact that people nowadays, that this is common knowledge, how you can read a cell phone record and understand what that data means. Additionally, Your Honors, I think it's important to point out that the testimony of Detective Rita in terms of the radius of the cell tower was not elicited by the people. That was a question on cross-examination by the defense attorney. The defense attorney was the only one in this case who attempted to elicit what may have been considered expert testimony. That was not brought forth by the people. The people never asked Detective Rita to state an exact pinpoint location of the defendant. That was not the testimony. As a matter of fact, Detective Rita never opined where he thought the defendant was located. In terms of the cases that counsel cited in her brief, I think it's important to draw a distinction between the case law I cited and the case law she cited. Where cell phone testimony was determined and deemed to be expert, it was more than just an individual reading actual facts from the cell phone records and just placing it on a historical graph. As you can see in United States v. ELA Davis, that was a situation where the detective was asked to describe something that was contrary to common knowledge, and that was where they were spoofing a cell phone number. So, for example, my personal cell phone number, I was using someone else's cell phone number to try and cover that. Additionally, as you can see from the case that she cited, Hill, it was a situation where a defendant's cell phone was rapidly moving, and in that case, it was a graph that was pointing to all of the different cell phone towers that that cell phone connected to to try and show a direct line of the movement of travel. Additionally, in that case, the detective was speaking about the number of antennas, the height of an antenna, the topography, obstructions that could affect a cell signal, and additionally, in that case, the court actually determined that it was not an abusive discretion to admit the cell phone records, but did caution the state to not present evidence without clearly indicating the level of precision or imprecision of that particular expert evidence. Additionally, I think it's important to note that the case cited Natal discussed that the testimony of the strongest available signal, it was speaking about how cell phones jump to the strongest signal and that the strongest signal may not be the closest tower. Justices, that was not the testimony in this case. As a matter of fact, no one ever came close to opining or stating anything of that sort. So I think it's very important to draw a distinction between that. Additionally, Justices, counsel argues that this type of testimony about cell phone records might be confusing to a jury. I think it's important to look at from the record. There was only one question that the jury had for the judge in this case, and that question was in terms of statements from Allison Dubonetti and Tequila Young. They never asked any questions about the cell phone records, so I'd argue that this isn't something that is beyond the purview of a lay witness. Well, that didn't necessarily mean they understood it. It just meant that they were not confident. Well, I wasn't going to say that about a jury, but it didn't necessarily mean that they had any concerns about it. But your premise is that it's not about cell phone records. Maybe they believe the witnesses and didn't even look at the cell phone records, correct? That's correct. That might not have been a consideration because as the defendant's theory was put forth, the cell phone records really shouldn't matter if they believe the defendant's theory of the case. As Justice Jorgensen stated, Allison Dubonetti stated that Christian Ross Emerson took the black van that was used in the armed robbery and that the defendant's cell phone was in that van. So as a matter of fact, it would make sense that that cell phone would ping to a tower near the armed robbery because we know Christian Ross Emerson was there. He admitted to it. And so that would actually further make sense and corroborate the defense's theory of the case. Justice, I think it's important to note, too, that this case hinges on the important evidence, which was the testimony of the co-defendants and eyewitnesses. And I think a really important witness in this case is Tequila Young. She had no bias in this case, and she stated that the defendant and the defendant's girlfriend attempted to have her testify as an alibi witness on behalf of the defendant, stating that he was located at Allison Dubonetti's mother's house on the date of the crime at approximately 9 p.m. She stated that she went to the defense attorney's office down in Chicago, and when she was informed about the seriousness of this case, she said she could not do that. And then she further came and testified on behalf of the people and stated that, yes, I did not see the defendant at Allison Dubonetti's mother's house on December 2, 2011, between 9 and 9.30. I think that's important because the defense's case rested solely on alibi witnesses. And Tequila Young, who had, like I said, no bias or interest in this case, she stated, I didn't see the defendant located where he stated that he was on December 2, 2011. Additionally, Your Honors, I think it's also important to note that the defense in this case stipulated to the cell phone records. And not only did the defense stipulate to those cell phone records, but at no point did the defense ever ask to redact the latitude and longitude from the cell phone records. That was not something he asked. As a matter of fact, defense counsel even went so far as to say that, yeah, he agreed to let those records in, and he wanted the jurors to draw their own inferences from those cell phone records. And that's exactly what they did in this case. As a matter of fact, the judge in this case could have taken judicial notice of the latitude and longitude that was located in the cell phone records for where the cell tower sites were located. The graphs that the people provided with Google Maps were just merely something to give a little bit more context, but obviously something such as Google Maps is not something that an expert need, that you need an expert to be able to introduce into evidence. In terms of the closing argument by the people, counsel argued that the people made inferences from those cell phone records. And, Justice, I believe that in this situation the state obviously is allowed to argue inferences. And not only that, but the comments that counsel claimed were inappropriate, those were made in rebuttal. And I think it's important to note that during the defense's closing argument, the defense spent a great amount of time trying to discredit the two eyewitnesses, trying to discredit the two co-defendants. And in this situation, the cell phone records that the people were speaking of were used to corroborate what our witnesses said. And when I say corroborate, not only the location, but I think it's more important that to corroborate the two co-defendants were able to describe to a tee the time of the cell phone calls that they had with the defendant in regards to the armed robbery, but what those conversations, what the context was in the duration of those cell phone calls. In terms of the comment that counsel made earlier about the course of investigation emergency search warrant radius testimony, I think it's important to put that into the full context. Detective Rita was asked on direct exam towards the beginning of his testimony basically how his course of investigation led him to any possible defendants in this case. And at that point, he had not named any of the three defendants. And what Detective Rita was discussing when he said an emergency search warrant for cell phone records was that at that point they had no leads, and that was something that they utilized to try and figure out who was involved in the armed robbery. At that point, Detective Rita never testified that the defendant's specific cell phone placed him in a certain radius or a one to three mile area of the armed robbery. That was not the testimony. The testimony was just purely what his course of investigation was and what materials he was gathering to even have a lead to follow up on. So I think it's important to draw a distinction there. Does he have to describe his investigatory process to, you know, step by step by step indicating this is what I did? Or can he say he secured them and from that information I went forward with my investigation? I think in order to have a full record and in order to have a timeline that makes sense to the jurors and to lead them to not have their own questions or wonder how the officer got to from point A to point B, I think it's important to have all of the information out there so the jurors can kind of have a better understanding. Otherwise, the only information they would have had was I ordered documents and then I ended up at the defendant's home. That wouldn't make too much sense. And so I think it's important to give context for the jurors to understand how the officer got from point A to point B. All right. So what constitutes an expert then in this particular field? What questions would one ask? If this is what would be considered appropriate or necessary investigatory process, what kind of an expert do we need? In terms of an expert, an expert testimony in this situation would be an individual who can specifically speak to exactly how cell phone towers work, and not only additionally exactly how cell phone towers work, but something that is above the purview of a lay witness. For example, like I spoke about earlier, if you're using someone who's going to talk about the pinging of a cell phone amongst multiple towers when there's not even phone calls happening, where it's a phone that's just connecting to a cell phone tower for a GPS, for example. Or, for example, in the case that came out of the Seventh Circuit, People v. Evans, in that situation there was a cell phone expert that was attempting to use what was called a granulization theory. Thank you, Justice. In addition to that, as I was stating, a situation where the expert is explaining a more thorough way in which cell phone towers are used to have the ultimate conclusion that they can pinpoint within feet where a defendant was located on a certain date or time. Was that necessary in this case under the circumstances? Was that critical evidence in this case? No, it was not. In terms of the evidence in this case, the state operated under the theory that the cell phone records merely corroborated what our eyewitnesses and what our co-defendants stated and did not corroborate what the defendant's alibi witnesses stated. This was not a case that hinged solely on cell phone records. For example, a case that would hinge solely on a cell phone record would be, for example, if someone was murdered and the only cell phone that pinged within the radius of the time of death was a particular defendant's cell phone. And that's the only evidence. That is the sort of case that a cell phone, you need an expert because that is your only evidence. But in this case, there was an avalanche of objective evidence and the cell phone records here merely corroborated that evidence. Thank you. Thank you, Justices. Ms. Fick? There are several points that I'd like to make. First, I want to address the fact that the radius guessing by Detective Rita was brought out on cross-examination. That's actually, that was brought out on cross. However, the other quotes that I've included in the brief and that I spoke to you about were things that he stated on direct. But did he, all right, was he asked the question or did he describe, as counsel has indicated, this is what I did to investigate this case in order to obtain leads? Is he describing his investigative process or is he testifying as an, as you've indicated, a person who is an expert who hasn't been qualified as an expert? He can testify as to his investigations as a police officer. However, our contention is that it is just too prejudicial. And to say that these were not important or that the state's case did not hinge on them is inaccurate because in the closing, the prosecutor said these were the lie detectors. These are the things that show the ultimate truth. They don't lie. However, you have none of the victims identifying Mr. Moretta. The records that, again, we contested, the alibi that we have, there's not a lot. And then the other co-defendants, that's not an avalanche of evidence. That's questionable. And the state understood that because they wanted to point out how important these records were. Regarding the cross-examination, that's another one of the problems with having a lay person testify, is that on cross-examination, you're limited to what they said and you don't have the opportunity to testify to ask those questions because the lay witness, you know, because doing so would elicit the wrong information. So the defense counsel was just handcuffed in what he could ask and how he could show that this was incorrect. As far as the case law is concerned, there's also a lot of case law that talks about the fact that these are province of experts. I'd like to ask a question, too. I believe the record does not reflect that the officer was asked a question that was phrased in a way in which he was opining with a reasonable degree of expertise in the area of cell phone technology. Is that correct? He was opining. It was not an elicited answer. The question I asked was, was the question phrased that within a reasonable degree of certainty as an expert in cell phone technology, blah, blah, blah, and then he said yes, no, or otherwise. He said that he did not. No. Okay. Listen to the question. Okay. Because I'm talking about the question. Okay. Was the question ever broached? Was it ever said? Did the record contain a question where the interrogator asked the witness within a reasonable degree of certainty expertise relative to cell phone technology? Was there ever a question asked in that format? Yes. What was it? Tell me what it was about. To the best of my recollection, the question was, are you able to say definitively or with an expert opinion the radius of these cell towers? The detective said no, but then he also opined that he thought it was about three miles. He said no, he couldn't. Okay. The case law that we were talking about, I urge you to follow. Is that the only instance that you're aware of? On cross-examination? No, where he was asked an expert opinion, i.e., was he asked. With the slanguage of, in your opinion, as an expert in cell phone technology, do you have an opinion based upon a reasonable degree of scientific certainty? And your response was, he answered no to the question about radius. My question now is, was there any other question broached like that? Your Honor, I do not recall precisely. To the best of my knowledge and recollection, I don't believe there was. But, again, I'm sorry I don't have that precise answer. Okay. Any other questions? Not right now. I will give you a short moment to discuss the issue of alleged error relating to closing argument and specifically respond, if you would, to Ms. Grebelinsky's statement relative to most of these statements were made during rebuttal. Do you agree with that? No. There were several statements that were made in rebuttal, certainly. But the first couple that I actually mentioned when I was first arguing did not happen at rebuttal. They were just showing the jury, this is how important this information is. So there were certainly comments made in rebuttal, but not all of them. The prosecutorial misconduct, it just goes to further exacerbate the problems that we have. The prosecutor argued issues not in evidence. He said Tekillion was hungover. We don't know that she was hungover. There is nothing to show that. He often said, we the state doing this and using it not as a way, the general we, but specifically for the state's attorney's office, which is inappropriate. If you have any other questions on that account, I would be happy to answer them. Otherwise, I ask that this judgment be reversed and the case remanded for a new trial. Thank you. Thank you. Thank you. It will be a short recess. We have other cases on the call.